UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                             :
ELI CALERO,                                                  :
                                                             :      16 Civ. 6582 (PAE)
                                        Plaintiff,           :
                                                             :      OPINION & ORDER
                -v-                                          :
                                                             :
CAROLYN W. COLVIN,                                           :
Acting Commissioner of Social Security,                      :
                                                             :
                                        Defendant.           :
                                                             :
------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

*Pro se* plaintiff Eli Calero brings this action pursuant to Section 205(g) of the Social Security Act, codified at 42 U.S.C. § 405(g), for judicial review of the final decision of the Commissioner of Social Security (the "Commissioner") that Calero was not disabled and was thus entitled to neither disability insurance benefits ("DIB") nor supplemental security income ("SSI"). On April 30, 2013, Calero filed his initial application for DIB and SSI, claiming that the femur in his left leg was "shattered" and that his right heel was "fractured." R. 51, 57. On June 20, 2013, this application was denied based on the written record. R. 51–62; *see also* R. 68–75 (notifying Calero of denial on June 25, 2013). On April 24, 2015, the application was denied again, based on that record and on testimony received at hearings before Administrative Law Judge Sheena Barr on December 10, 2014, at which Calero appeared *pro se*, and on March 25, 2015, at which he was represented by counsel. R. 9–16. Calero sought review by the Appeals Council; on June 15, 2016, it denied review. R. 1–4.

On August 19, 2016, Calero appealed the Appeals Council's denial to this Court. Dkt. 2. On January 28, 2017, the Commissioner moved for judgment on the pleadings. Dkt. 10. Calero

1

has not filed an opposition, despite the Court's August 26, 2016 order notifying Calero of his right to do so. Dkt 6. For the following reasons, the Court grants the Commissioner's motion.

I. **Background**

   A. **Non-Medical Evidence**

Calero was born on March 23, 1982. He lives with his mother in a first floor apartment. R. 31–32. Calero's disability claim stems from an accident on May 18, 2012. A cab driver ran a stop sign and collided into Calero, who was aboard his motorcycle. R. 25. Calero's left femur was shattered in the accident, and the calcaneus in his right heel was also broken. *Id.* Calero's femur was surgically repaired with a metal rod and screws; his calcaneus was left to heal on its own. *See id.*

Calero personally reported both improvements from the surgery and a lasting impact from the accident. Following his discharge from the hospital, Calero initially used a wheelchair, but progressed to crutches, then to a cane, and today walks unassisted. R. 26. In his testimony before the ALJ, Calero indicated that he does household chores such as laundry, can walk a couple of blocks, can dress himself if he leans on something, and can take the train. *See* R. 26, 32–34. Nevertheless, Calero reports having days where he cannot get out of bed because his legs are too swollen from twitching or from his bones hurting from the night before. He said that he sometimes wakes up in the middle of the night due to a "burning sensation in his knee." R. 30; *see also* R. 34. Calero's pain improves upon taking medications such as Tramadol and Cymbalta, but those medications, in his experience, have substantial side effects. R. 30–31.

As to treatment, at the December 10, 2014 hearing, Calero testified that he could not remember if he had seen doctors since November 2012. He did remember that he had not been to the hospital or the emergency room. R. 46–47. At the March 25, 2015 hearing, Calero testified that he had attended physical therapy, but stopped for a number of years because of the

difficulty in staying at the treatment facility all day and because of the cost of paying for parking (or parking tickets). R. 27–28. As of that hearing, Calero had resumed physical therapy. R. 33.

Before his injury, Calero had been working. Between June 1995 and August 2007, he worked for a storage company as a transporter; between June and August 1999, he worked as a supermarket stock person; between November and December 2008, he worked as a maintenance worker; and between early 2009 and 2012, he worked for a pharmacy as a delivery truck driver. R. 185. Calero has not held a job since. He attended school through the ninth grade, has not gone to vocational or trade school, and does not have other specialized training. *See* R. 180.

### B. Medical Evidence

#### 1. Treating Sources

After the motorcycle accident, Calero was taken to the emergency room at Lincoln Medical and Mental Health Center. R. 277. There, he was diagnosed with a closed fracture of the right calcaneus and a closed fracture of the left femur. R. 269, 295; *see also* R. 25. No surgery was performed on his calcaneus fracture, but, on May 21, 2012, the femoral fracture was repaired using a surgical rod. R. 251, 265–66. On May 24, 2012, Calero was discharged from the hospital. R. 251.

Over the next few months, until the end of 2012, Calero had several visits to an orthopedic clinic and, for physical therapy, to the hospital where he had originally been treated. Calero's medical records indicate that he reported "some pain" in his lower left extremity, R. 239, 242, 246, and listed that pain as his chief complaint, R. 233, 236. At all times, Calero denied numbness and tingling. R. 230, 233, 236, 239, 242, 246. Initially, after discharge, Calero used a wheelchair. R. 26. On June 7, 2012, physician's assistant ("PA") Gregory Nikolos recommended Calero use a walker. R. 245. By Calero's August 10, 2012 visit, however, PA Nicole Siegel indicated that Calero had been using a cane for three weeks. *See* R. 239. This

observation that Calero could ambulate with a cane was reiterated during physical therapy sessions on September 27 and October 16, 2012, although physical therapist ("PT") Pradeep Bansal noted that Calero had an antalgic gait on his left lower extremity with reduced weight bearing. R. 307, 309. Calero reported pain in his left knee during these appointments, at a "5" on September 27 and a "7" on October 17. *Id.* That pain was worse in the morning, with walking, and when standing up from a seated position. *Id.* By his November 30, 2012 physical therapy, Calero was ambulating without a gait aid, although his gait on his left lower extremity remained antalgic with reduced weight bearing. He continued to report pain at a "4," which improved after therapy to a "3." R. 311.

Calero also had imaging done during 2012. Medical notes from June, October, and December show that, according to x-rays, Calero's left femur was in good alignment, the surgical hardware was in place, the calcaneus fracture in his heel was in acceptable alignment, and that his calcaneus was healing. R. 239, 242. On June 28, 2012, Dr. Moore, the physician who performed the surgery, noted that Calero's "femur x-ray [was] good." R. 242. On October 12, 2018, PA Siegel suggested that Calero's left femur remained the same from his last visit with "no further healing." R. 233; *see also* R. 224–25. In December 2012, an x-ray suggested Calero's right calcaneus was healing satisfactorily but that, compared to the previous study, both the calcaneus and left femur remained unchanged. R. 226–27, 230. The doctor recommended a CT scan of his left femur. R. 226–27, 230. On December 27, 2012, a CT scan revealed "minor bony bridging at the superior aspect of the largest lateral fracture fragment." R. 228. "[E]lsewhere, non-union [was] seen." *Id.* The implications of these observations are unclear; it does not appear that Calero followed up on those results.

4

Calero's medical treatment record is spotty after December 2012. A disability appeal form, which appears to have been completed in consultation with Calero, indicates that he was treated by two different doctors in 2013: Dr. Sireen Gopal of New York Spine and Sport and a Dr. Erlich of Montefiore Medical Group. R. 202–03. According to that form, Dr. Gopal prescribed Cymbalta and Tremadol. R. 202. The administrative record, however, lacks any treatment forms from Dr. Gopal, and suggests that records could not be found. R. 200. The administrative record does contain one medical form from Montefiore's Center for Orthopedic Specialties, but it was filled out by a Dr. Evan Schwechter in 2014, not Dr. Erlich. That form prescribed physical therapy on Calero's left knee and diagnosed him with "quad atrophy" and chondromalacia patellar. R. 317. Calero testified that he did not remember whether he had seen any doctors after November 2012, although he did mention Dr. Schwechter. R. 46–47. He did not mention Drs. Gopal or Erlich during either round of testimony. R. 22–41. Calero's attorney did not suggest that any medical records were missing from the administrative record. *Id.*

On January 8, 2015, Calero resumed physical therapy. R. 329. The referring physician is listed as Dr. Schwechter. *Id.* According to those records, Calero was by then independently completing his chores and daily activities, with only "mild difficulty and pain." His impairments were listed as "left knee pain," "difficulty standing or walking for too long," and "pain during running/playing sports." R. 329, 334, 339, 344, 349, 354. His mobility status was listed as "at least 40% but less than 60% impaired, limited or restricted." *Id.* The record reflects that Calero's last physical therapy session was on March 3, 2015, R. 363–66, a few weeks before his second hearing before the ALJ.

### 2. Consulting Sources

Calero also underwent two consultative examinations: an internal medicine examination by Dr. Iqbal Teli on June 12, 2013 and an orthopedic examination by Dr. Marilee Mescon on

5

February 5, 2015. R. 319–21, 329–66. According to Dr. Teli's notes, Calero reported continuous, burning-like pain in his knees, assessed at a 4 out of 10 and that increased with walking, since 2012. R. 313. Calero also reported pain in his right heel. *Id.* He reported taking Cymbalta and Ultracet for pain, and, as part of his activities of daily life, cleaning two times a week and showering and dressing every day. *Id.*

Dr. Teli's clinical observations were as follows: Dr. Teli reported that Calero "appeared to be in no acute distress." R. 314. He had "slight limping on the left side, [could] walk on heels and toes without difficulty," could squat fully, and had a normal stance. *Id.* Dr. Teli observed that Calero did not need help changing in the exam room or getting off the table, and that Calero was able to "rise from [the] chair without difficulty." *Id.* According to the report, Calero had full rotation of his knees, ankles, shoulders, elbows, forearms, wrists and hips bilaterally and his joints were "stable and nontender." R. 314–15. He assessed Calero's strength as a 5 out of 5 in both his upper and lower extremities. While Dr. Teli noted that Calero used a cane for balance when he went out, Dr. Teli determined that "[m]edically, [Calero did] not need it." R. 314. Dr. Teli diagnosed Calero with status post-surgery for fracture of the left femur, a history of fracture of the right calcaneous, a history of right heel pain, and a history of bilateral knee pain. R. 315. Dr. Teli found that Calero had mild restrictions for "prolonged walking and climbing," and that his prognosis was stable. *Id.*

Seeking a more up-to-date consultative evaluation, the ALJ decided at the December 10, 2014 hearing to send Calero for a second such examination, ultimately performed by Dr. Mescon. R. 49. During the examination, Calero reported pain in his left femur ranging from a 3 to a 6 out of 10 while taking a medication that he could not name. R. 319. He also reported pain in his right foot at 10 out of 10, although he reported never receiving physical therapy for that

6

foot and not wearing a brace or other orthopedic device. *Id.* Calero also reported back pain, which he attributed to his motorcycle accident. *Id.* As to his daily activities, Calero reported being able to cook, clean, do laundry, shop, bathe, shower, and dress. R. 320. He also reported spending time watching television, listening to the radio, and reading. *Id.*

Dr. Mescon's clinical observations were that Calero was in no acute distress, had a normal gait, was able to walk on his heels and toes without difficulty, could squat fully, stood normally, and did not use an assistive device. R. 320. During the visit, Dr. Mescon noted that Calero did not need help "changing for the exam or getting on and off [the] exam table" and was able to rise from his chair without difficulty. *Id.* She reported that he had full rotation in his knees and ankles bilaterally and no joint "effusion, inflammation, or instability." R. 321. She observed that he had strength in both his upper and lower extremities measured at a 5 out of 5. *Id.* Ultimately, Dr. Mescon diagnosed him with "multiple trauma" and reported that while Calero had no limitations on his ability to sit, "his capacity to stand, climb, push, pull or carry heavy objects would be severely limited." *Id.*

Unlike Dr. Teli, Dr. Mescon filled out a medical source statement form. On it, Dr. Mescon indicated that Calero could sit for one hour continuously and stand and walk for a half hour each continuously. *See* R. 323. She reported the same one hour and half hour time limits for the total number of hours Calero could work in an eight-hour day. *See id.* However, she did not fill out the portion of the form asking whether the claimant could not sit, stand, or walk for a total of eight hours, or what else he could do during that time. *See id.* Dr. Mescon indicated that Calero could not complete any postural activities—that is, climb stairs and ramps, climb ladders or scaffolds, balance, stoop, kneel, crouch, or crawl—or use his right foot to operate foot

7

controls. R. 324–25. However, she noted that he did not have environmental limitations or limitations in the use of his hands, and could lift and carry from 11 to 20 pounds. R. 324, 326.

### C. Administrative Proceedings

#### 1. Vocational Testimony

At the March 25, 2015 hearing, Melissa Fass-Carlin testified as a vocational expert; Calero stipulated to her qualifications. Fass-Carlin identified Calero's relevant past experience as being a delivery truck driver, DOT job code 292.353-010, which is "medium, semiskilled work." R. 37.

The ALJ then posed the following hypothetical: "[I]f I were to ask you to assume a hypothetical individual of the same age, education and work experience as the claimant, who would be limited to work at the sedentary exertional level, but would have occasional postural limitations and all postural categories . . . and would never be able to use their feet to operate foot controls . . . clearly they can't do their past work. Would there be . . . other work they can do?" R. 38. Fass-Carlin responded that Calero could not do his past work but could perform sedentary, unskilled work as an order clerk, DOT job code 209.567-104, a charge account clerk, DOT job code 205.367-014, and an addresser, DOT job code 209.587-010. *Id.* Those positions have 18,921, 33,084, and 19,004 jobs in the national economy, respectively. *Id.* Those jobs allow individuals to be off-work for five percent of their work day. R. 38–39. But, if an individual were off for 10 percent of the workday that would eliminate all possible work. *See id.*

#### 2. The ALJ's Decision

In a decision dated April 24, 2015, the ALJ found that Calero was not disabled between November 2, 2012, the date of the alleged onset of the disability, and the date of the ALJ's opinion. R. 9. Thus, Calero was ineligible for disability insurance and supplemental social security income. R. 15.

8

In reaching this conclusion, the ALJ applied the five-step process for evaluating disability claims set out by 20 C.F.R. § 416.920(a). At step one, the ALJ found that Calero was not engaged in substantial gainful activity. R. 11. At step two, she found that he had a severe impairment. R. 12. At step three, she found that his impairments did not meet or equal any listing, including listings 1.02, 1.03, and 1.06. R. 11–12.

Between steps three and four, the ALJ also found that Calero had residual functioning capacity "to perform sedentary work as defined in 20 C.F.R. 404.1567(a) and 416.967(a) except [that Calero] has occasional postural limitations in all postural categories. The claimant can never use feet to operate foot controls due to ankle pain." R. 12.

The ALJ came to this conclusion by crediting and discrediting various sources of evidence. She placed highest reliance on Dr. Teli's opinion—which supported a finding of no disability, R. 13, and which she found "consistent with and supported by the record in terms of the claimant's lack of treatment for his condition and to some extent even the recent physical therapy records." R. 14.

The ALJ gave Dr. Mescon's opinion only "some weight due [in part] to the lack of treatment of the claimant and the lack of familiarity with the claimant's impairment." *Id.* The ALJ viewed Dr. Mescon's conclusions about Calero's disability as "not supported by the record in terms of the claimant's lack of ongoing treatment for his conditions and the objective evidence that showed the claimant's fractures were healing." The ALJ noted inconsistencies between Dr. Mescon's conclusions and clinical findings, Calero's assertions that he is independent in his daily activities, and her own estimate as to Calero's ability to sit for prolonged periods of time.

At step four, the ALJ found Calero was unable to perform his past work. R. 14. At step five, she found that there were jobs in the national economy in significant numbers that he could perform based on the testimony of Fass-Carlin. R. 15.

Therefore, the ALJ determined, Calero was not disabled under the standards of the Social Security Act. *Id.*

## II. Discussion

### A. Standards for Disability Eligibility

A claimant is disabled under the Social Security Act if he can demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Not only must the claimant be unable to perform his previous work, but he "cannot, considering his age, education, and work experience, [be able to] engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

The Social Security Administration, pursuant to its authority under the Social Security Act, has established a five-step procedure for evaluating such claims of disability: "(1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a "residual functional capacity" assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience." *McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014); *see* 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v). If a claimant is determined to have or

not to have a disability at any step, the procedure is satisfied and the evaluation need not proceed to the next step. *Williams v. Apfel*, 204 F.3d 48, 49 (2d Cir. 2000). The claimant has the burden of proof for steps one through four, and the ALJ has the burden at step five. *DeChirico v. Callahan*, 134 F.3d 1177, 1180 (2d Cir. 1998).

### B. Standard of Review

When reviewing a final decision of the Commissioner, the district court determines whether that decision applied the appropriate legal standards and is supported by substantial evidence. *See Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per curium). "Substantial evidence is 'more than a mere scintilla.'" *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012) (per curium) (quoting *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009)). "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Selian*, 708 F.3d at 417 (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). This standard is very deferential to the ALJ—"even more so than the clearly erroneous standard." *Brault*, 683 F.3d at 448.

In making its determination, the Court reviews the entire record. *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curium). However, the Court must "defer to the Commissioner's resolution of conflicting evidence." *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012). When there is substantial evidence supporting both sides of a claim for benefits, the administrative determination controls. *Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990). The opinions of treating physicians are preferred, and are even controlling on the ALJ as long as they are supported by medically acceptable diagnostic techniques and are not inconsistent with other substantial record evidence. *See Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008). However, a consultative physician's opinion can serve as the primary evidence

11

supporting an ALJ's decision, especially when corroborated by other medical records. *See, e.g., Monguer*, 722 F.2d at 1039.

The ALJ need not fully credit the evaluations of every treating or consulting physician. Grounds for an ALJ to give limited weight to a physician's conclusions include: inconsistencies with the rest of the administrative record and internal inconsistencies. *See, e.g., Gates v. Astrue*, 338 F. App'x 46, 49 (2d Cir. 2009); *Michels v. Astrue*, 297 F. App'x 74, 75–76 (2d Cir. 2008).

In addition to the requirement that the ALJ base its decision on substantial evidence, the ALJ has a general duty to develop the administrative record. This duty applies even when the claimant is represented by counsel because social security disability hearings are non-adversarial. *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996). However, the ALJ must seek out additional evidence only if there are "obvious gaps" in the record. *Rosa v. Callahan*, 168 F.3d 72, 79 n. 5 (2d Cir. 1999); *Swiantek*, 588 F. App'x at 84; *see also Lopez v. Comm'r of Soc. Sec.*, 622 F. App'x 59, 60 (2d Cir. 2015) (suggesting a more probing standard in *pro se* cases).

### C. Evaluating the ALJ's decision

#### 1. Substantial Evidence

The ALJ's determination that Calero was not disabled between November 2, 2012 and the date of her decision is supported by substantial evidence. The Court assumes as correct the ALJ's determinations favorable to Calero: to wit, that he was not engaged in substantial gainful activity, had a severe impairment, and was not capable of returning to his previous work. The ALJ ruled adversely to Calero as to three points: (1) that he did not meet a listed impairment, (2) that he had the residual capacity to perform sedentary activity subject to certain limitations involving the use of his feet and involving his posture, and (3) that there were jobs in the national economy in sufficient numbers that he could perform. The Court reviews these determinations in turn, and finds each to be well-founded.

First, substantial evidence supports the ALJ's determination that Calero's condition does not meet listings 1.02, 1.03, and 1.06. Given his claimed disability, Calero would need to be unable to ambulate effectively, as defined by the regulations, for any of the three listings to apply. Under 20 C.F.R. pt. 404, subpt. P, app. 1 § 1.00B(2)(b), "[i]neffective ambulation is defined generally as having insufficient lower extremity functioning . . . to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities." Calero's impairment does not meet that definition. The medical records reveal that, by November 2012, Calero was walking without a cane. And, as the ALJ noted, Calero testified on March 25, 2015 that he could walk several blocks without an assistive device. Moreover, even if Calero needed a cane, he would not be limited in the functioning of *both* of his upper extremities. *See Jones v. Berryhill*, 681 F. App'x 252, 255 (4th Cir. 2017) ("[The claimant's] occasional use of a single cane does not qualify as 'inability to ambulate effectively' which . . . is defined by regulation to require two-handed assistance with walking."). Therefore, Calero's impairment does not meet Appendix listings 1.02, 1.03, and 1.06. And he has not argued—here or below—that other listings apply.

Second, there is substantial evidence to support the ALJ's finding that Calero had the residual functioning capacity to perform sedentary work, save that he cannot use his feet to operate controls and that he has occasional postural limitations. Sedentary work is defined as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R. §§ 404.1567(a); 416.967(a). A sedentary worker is required to sit for six hours and stand or walk for no more than two hours during an eight-hour work day. *See Carvey v. Astrue*, 380 F. App'x 50, 52 (2d Cir. 2010); *Rosa*, 168 F.3d at 78 n.3. Dr. Mescon reported that Calero could lift and carry between 11 and 20 pounds. And both she

13

and Dr. Teli reported that Calero had 5/5 strength in both upper and lower extremities. Nothing in the record calls this into question.

The ALJ's assessments of Calero's ability to stand and walk and to complete some activities in all postural categories requires more extended discussion. None of Calero's treating physicians opined on how long he could sit, stand, or walk throughout the day, or on his ability to complete occasional postural activities.[1] Thus the ALJ, appropriately, looked instead to the consulting physicians for guidance on these points. The Court considers whether their assessments, in conjunction with other evidence in Calero's medical records, supplied substantial evidence supporting the ALJ's conclusions. The Court takes Calero's ability to stand and walk first, followed by his postural limitations.[2]

Dr. Teli—after personally examining Calero and noting both his ability to walk on his heels and toes without difficulty and the fact that he did not need a cane—determined that Calero had only mild restrictions on his prolonged walking and climbing. That finding is consistent with Calero's being able to complete not only sedentary work but also light work, a more physically demanding type of work. *See Lewis v. Colvin*, 548 F. App'x 675, 677 (2d Cir. 2013) ("[T]he ALJ's determination that [the claimant] could perform "light work" is supported by [the

---

[1] In 2015, Calero's physical therapist stated that he had difficulty standing or walking for "too long." *E.g.*, R. 339. Although this statement is imprecise, the Court infers that the therapist viewed Calero's condition as permitting intermittent standing and sitting. The PT also listed "balance" as a problem for Calero, but did not elaborate. *Id.* While the Court views these statements as too imprecise to be conclusive, to the extent these observations are inconsistent with the ALJ's decision, they are not controlling: Physical therapists are not considered treating physicians under social security regulations and their opinions are not entitled to controlling weight. *See, e.g., Corson v. Astrue*, 601 F. Supp. 2d 515, 531 (W.D.N.Y. 2009); *see also Diaz v. Shalala*, 59 F.3d 307, 313 (2d Cir. 1995) (discussing chiropractors). On December 20, 2017, Dr. Amna Diwan wrote in her treatment record that Calero reported that he was "unable to do any heavy physical activity." R. 231. This, too, is consistent with the ALJ's determination.

[2] The Court takes as a given the favorable determination, from Calero's perspective, that he cannot use his feet to operate controls.

14

doctor's] assessment of 'mild limitations for prolonged sitting, standing, and walking. . . .'"); *see also Harrington v. Colvin*, No. 14-CV-6044P, 2015 WL 790756, at *14 (W.D.N.Y. Feb. 25, 2015) (collecting cases). Dr. Teli's observations are corroborated by other evidence, such as the 2012 imaging that revealed that Calero's right calcaneus was healing and that his left femur was in proper alignment, the observations by PA Seigel and Calero's physical therapists in 2012 that he did not need a cane to walk, and Calero's own statements that he could walk several blocks and complete his daily activities independently.

To be sure, Dr. Mescon's more pessimistic assessment of Calero's ability to sit, stand, and walk conflicts with Dr. Teli's. The ALJ, however, to whom deference is due, had valid reasons to give limited weight to Dr. Mescon's conclusion. Dr. Mescon's opinion is contradictory and inconsistent with her own clinical examination.[3] *Cf. Gates*, 338 F. App'x at 49 (2d Cir. 2009) (dismissing internally inconsistent medical opinion). In the check-box portion of her Medical Source Statement, Dr. Mescon indicated that Calero could sit for only an hour both continuously and during a work day, but in the narrative portion of her orthopedic examination, she indicated that he had *no* limitations on his ability to sit. In the check-box portion of her report, she also indicated that Calero could stand and walk for a half hour each, *both* continuously and in total during a work day, but failed to list, as prompted by the form, any other activities he could do during that eight-hour window. This observation is in tension with her

---

[3] Dr. Mescon's opinion may also have been based on exaggerations of physical pain by Calero. He told Dr. Mescon that his left knee pain was a 3 to 6 out of 10 and that his right foot pain was a 10 out of 10. He also mentioned back pain related to the accident. Calero, however, had told his physical therapist in November 2012 that his foot pain was only a 2 out of 10 and that his knee pain was a 4 out of 10; and he similarly told Dr. Teli that his knee pain was also a 4 out of 10. The meeting with Dr. Mescon appears to be the only time that Calero claimed greater pain from his right foot than from his left knee; and the medical records do not report prior complaints about his back.

clinical examination, which revealed only "coarse crepitus" in Calero's left knee, and Calero's activities of daily living, such as shopping, which he reported to Dr. Mescon. R. 320–31. Dr. Mescon's bottom-line assessment is also in tension with other medical evidence, such as the X-rays that showed Calero's calcaneus was healing satisfactorily and that his left femur was in proper alignment. The limitations described by Dr. Mescon—including that Calero can neither stand nor walk for more than a half hour a day—may also be in tension with the assembled accounts, chronicled above, by various PAs and physical therapists. None of them reported such pronounced limitations during the relevant disability period.

In not fully crediting Dr. Mescon's assessment, the ALJ also fairly noted the lack of evidence that Calero had received regular treatment for his impairments between 2012 and 2015. As the ALJ recognized, there are no records of treatment, other than the consultative visits and a referral appointment with Dr. Schwechter, between the end of 2012 and the start of 2015. While at one point Calero seems to have reported having seen a Dr. Gopal and a Dr. Erlich in 2013, no records of such visits were put before the ALJ (or the Court). On the contrary, it appears that the Social Security Administration requested records from Dr. Gopal but received none; the record also reflects only one referral appointment with Montefiore Medical Center, where Dr. Erlich appears to have worked, but with Dr. Schwechter. Consistent with this, on December 10, 2014, when the ALJ asked Calero if he remembered seeing doctors after 2012, Calero said he did not remember. In rejecting Calero's claim of a greater disability, the ALJ was permitted to take into account the lack of evidence of medical treatment during this more than two-year period.

The ALJ's conclusion that Calero had occasional postural limitations is also supported by substantial evidence. The ALJ considered Dr. Mescon's conclusion that Calero's activities in all postural categories were limited, while properly noting that Calero's limitations were occasional,

16

rather than ubiquitous; as the ALJ fairly noted, Calero told Dr. Mescon that he was able to perform daily activities such as cooking, cleaning, doing laundry, shopping, showering, bathing, and dressing. Dr. Mescon also observed that Calero had full rotation of motion in his hips, knees, ankles, spine, shoulders, elbows, forearms, wrists and fingers. Dr. Teli found similarly; her report does not suggest that Calero had any postural limitations, other than on climbing for a prolonged period of time. The ALJ's assessment reflected a fair balancing of the assembled evidence.

Third, and finally, the ALJ's finding that there were jobs in the national economy that Calero could perform is also supported by substantial evidence. "In more complex cases a vocational expert may be consulted to determine whether there is other work in the national economy that an individual with the ability to do less than the full range of sedentary work may perform." *McIntyre*, 758 F.3d at 152 (internal citations and modifications omitted). Vocational experts do not need to identify each specific figure or source that supports their conclusions, as long as they identify the sources they use generally. Here, vocational expert Fass-Carlin pointed to the DOT job codes of all three jobs that Calero could do, according to her assessment. Calero did not challenge that assessment. The ALJ properly relied on Fass-Carlin's testimony and her use of the Vocational Guidelines, and particularly section 201.25, as a framework. On that basis, the ALJ found that there were jobs in sufficient numbers in the national economy that Calero could perform.

In sum, the ALJ's ultimate conclusion that Calero was not disabled was supported by substantial evidence.

### 2. The ALJ Sufficiently Developed the Record

As noted above, the ALJ has an independent duty to develop the record, save that, "where there are no obvious gaps in the administrative record, and where the ALJ already possesses a

17

'complete medical history,' the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim," *Rosa*, 168 F.3d at 79 n. 5; *see also Eusepi v. Colvin*, 595 F. App'x 7, 9 (2d Cir. 2014); *Lowry v. Astrue*, 474 F. App'x 801, 804 (2d Cir. 2012). In several ways, ALJ Barr discharged that duty here.

First and foremost, the ALJ stopped the December 10, 2014 proceeding to ensure Calero could obtain counsel. That resulted in Calero's being represented thereafter and in expanding the administrative record.

Second, the ALJ took affirmative steps to confirm that the record was complete. Noticing Calero's lack of treatment after 2012, the ALJ asked him at the first hearing on December 10, 2014 whether he had received treatment after 2012. As a result, the administrative record is more complete, in that it reflects the report of the additional doctor Calero mentioned at that time—Dr. Schwechter. The record further reflects that the Social Security Administration tried to find medical records from Dr. Gopal, but was unable to do so. Neither Calero, at either hearing, nor his attorney, at the second hearing, pointed to any additional treatment records. The administrative record, therefore, appears complete.

Third, in an effort to assure that the record was up-to-date, the ALJ had Calero evaluated by a second consultative physician and considered the records of Calero's most recent physical therapy treatment, in 2015.

These steps sufficiently discharged the ALJ's duty to sufficiently develop the record. Calero has not claimed otherwise.

## CONCLUSION

For the reasons articulated in this opinion, the Court rules in favor of the Commissioner and dismisses Calero's appeal with prejudice. The Clerk of the Court is respectfully directed to close this case.

The Court also directs the Clerk to mail a copy of this decision to the plaintiff at the address on file.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: September 26, 2017
       New York, New York